IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AARON T. JONES, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Civil Action No. 08-16 |
| | ) | Judge Terrence F. McVerry/ |
| MELVIN LOCKETT, Superintendent; | ) | Chief Magistrate Judge Amy Reynolds Hay |
| FRANCIS ROYER, Deputy | ) | |
| Superintendent; PAUL THOMAS, School | ) | |
| Principal; DAWN DAVIS, Librarian; | ) | |
| PATRICIA COLLINS, Librarian Assistant; | ) | |
| JAMES INGELBETCH, Correctional | ) | |
| Officer; JAMES SCEKERES, Deputy | ) | |
| Superintendent at S.C.I. Greensburg; | ) | |
| TREVOR WINGARD, Deputy | ) | |
| Superintendent at S.C.I. Greensburg; LORI | ) | |
| KWISNEK, Health Care Administrator; | ) | |
| ROBERT BUSSARD, Intelligence Captain | ) | |
| at S.C.I. Greensburg; TONI COLLAND, | ) | |
| Superintendent Assistant/Grievance | ) | |
| Coordinator/Public Relations Officer; | ) | |
| KENNETH NIEDIGH, Educational | ) | |
| Instructor at S.C.I. Greensburg; CHARLES | ) | |
| WALTERS, Academic Counselor at S.C.I. | ) | |
| Greensburg; JEFFREY A. BEARD, | ) | |
| Secretary of the States of Pennsylvania | ) | |
| Department of Corrections, | ) | Re: ECF Nos. 136 & 141 |
| | ) | |
| Defendants | ) | |

## REPORT AND RECOMMENDATION

## I. RECOMMENDATION

It is respectfully recommended that Defendants' motion for summary judgment, ECF No.

141, be granted. It is further recommended that Plaintiff's summary judgment motion, ECF No.

136, be denied as moot.

## II. **REPORT**

### A. **Relevant Procedural History**

This case has been the subject of prior proceedings. ECF No. 88 (Report and Recommendation) & ECF No. 95 (Order adopting Report). Those prior proceedings have dismissed all claims against all defendants except the following: (1) an Equal Protection claim against Defendants Thomas, Davis, Collins and Engelbrecht concerning Plaintiff being denied employment as an inmate library aide; (2) First Amendment claims of content based censorship against Defendants Collins and Davis for their alleged role in disbanding/discarding African American interest section of the library; (3) First Amendment retaliation claim against Defendant Walters where Walters "fired" Plaintiff from his peer to peer tutoring position; (4) an Equal Protection claim against Walters based upon the same "firing"; and (5) an Eighth Amendment deliberate indifference claim against Defendant Kwisnek as to denial of medication while in the Restricted Housing Unit ("RHU").

Aaron T. Jones ("Plaintiff") is a state prisoner who is proceeding pro se and has filed a civil rights complaint[1] where now, only six of the original sixteen Defendants remain. All six are Department of Corrections ("DOC") employees. Plaintiff complains about discrete events that transpired at SCI Greensburg, from roughly August 2007 to March 2008, when Plaintiff was then transferred out of SCI Greensburg to SCI Somerset.[2] After discovery, Plaintiff filed a Narrative

---

[1] The operative complaint herein is the second amended complaint. See, e.g., Report, ECF No. 88 at 5.

[2] Plaintiff was subsequently transferred from SCI Somerset to SCI Fayette. ECF No. 78.

Statement of Facts ECF No. 135, and a motion for summary judgment, ECF No. 136.

Defendants filed their response to, ECF No. 152, and their brief in opposition to, ECF No. 150, Plaintiff's motion for summary judgment, and their counter statement of facts, ECF No. 151, and a supplemental counter statement of facts, ECF No. 166. Plaintiff filed a sur-reply brief. ECF No. 192.

The Defendants filed their motion for summary judgment, ECF No. 141, a concise statement of facts, ECF No. 142, and a brief in support, ECF No. 143. Plaintiff filed his brief in opposition, ECF No. 186, his responsive concise statement, ECF No. 187, and an appendix of evidentiary materials, ECF No. 188, and a counter statement of undisputed facts, ECF No. 189, and an appendix attached thereto, ECF No. 190. Plaintiff also filed a supplemental pre-trial statement. ECF No. 191.

## B. **Standard of Review**

Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden to show or point out why there is no genuine issue of material fact. Walters ex rel. Walters v. General Motors Corp., 209 F.Supp.2d 481, 484 (W.D. Pa. 2002). Once that burden has been met, the burden shifts to the non-moving party who must set forth "specific facts showing that there is a *genuine issue for trial* . . ." or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

An issue is genuine only if the evidence is such that a reasonable jury could return a

verdict for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).

"Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no genuine issue for trial."  <u>Matsushita</u>, 475 U.S. at 587.  The inquiry involves determining whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  <u>Brown v. Grabowski</u>, 922 F.2d 1097, 1111 (3d Cir. 1990).  If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted.  <u>Anderson</u>, 477 U.S. at 249-50.

Moreover, it is not enough for the nonmovant to show that there is some dispute as to some  facts.  Rather, the "substantive law governing the dispute will determine which facts are material, and only disputes over those facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  <u>DeHart v. Horn</u>, 390 F.3d 262, 267 (3d Cir. 2004)(internal quotations omitted).

In reviewing the summary judgment evidence, the Court has no duty to search the record for triable issues; rather, it need rely only on those portions of the evidentiary record to which the nonmoving party directs its attention.  <u>Guarino v. Brookfield Township Trustees</u>, 980 F.2d 399, 404 (6th Cir. 1992);  <u>Northwestern National Insurance Company v. Baltes</u>, 15 F.3d 660, 662-63 (7th Cir. 1994)("judges are not archaeologists. They need not excavate masses of papers in search of revealing tidbits-not only because the rules of procedure place the burden on the litigants, but also because their time is scarce.").

In short, the summary judgment motion is an evidence testing device to see if there is sufficient evidence to support a party's position with respect to an issue for which that party bears

the burden of proof at trial so as to justify holding a trial.  Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001)(summary judgment is the "moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.").

**C. Discussion**

We will generally address Plaintiff's claims in the order in which they were raised in the operative complaint.

The first incident Plaintiff complains about is the fact that he was not "hired" for the inmate library clerk position.  ECF No. 61 at 2 to 3, ¶¶ 18 to 21.  Plaintiff claims that his not being hired by the Defendants violated his rights under the Equal Protection clause of the Fourteenth Amendment.  Plaintiff alleges that the Defendants denied him a job because of his race and gave an inmate library clerk job to other less qualified white prisoners.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.   In order to prove an equal protection claim, a plaintiff must adduce evidence showing that (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person."  Sabatini v. Reinstein, No. 99-2393, 1999 WL 636667, at *4-*5 (E.D. Pa. Aug. 20, 1999). See also  Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir.  1995).   Essentially, to demonstrate an equal protection violation, an inmate has the burden of showing under the second prong the existence of purposeful discrimination.  Hernandez v. New York, 500 U.S. 352 (1991); McCleskey v. Kemp, 481 U.S.

279, 292 (1987).  As explained by one court,

> In order to demonstrate a violation of the Equal Protection clause, a plaintiff must show more than discriminatory impact. *See Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264-65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Rather, "[p]roof of racially discriminatory intent or purpose is required[.]" *Id.* at 265; *see also Simpson v. Horn*, 80 F.Supp.2d 477, 481 (E.D.Pa.2000) (holding that prisoner cannot prevail on equal protection claim by showing that prison policy has the effect of segregating prisoners by race, but must demonstrate defendants' intent to cause segregation). "Discriminatory purpose ... implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected ... a particular course of action at least in part because of, and not merely in spite of, its adverse effects upon an identifiable group." *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (citation, punctuation omitted); *see also Hernandez v. New York*, 500 U.S. 352, 359-60, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

Brown v. Byrd, No. CIV.A. 00-3118, 2000 WL 1780234, at *4 (E.D.Pa., Dec. 1, 2000).

Defendants Dawn Davis, Patricia Collins and Paul Thomas interviewed Plaintiff for the position of library aide.  Defendant Davis was the librarian at SCI Greensburg.  Patricia Collins is an assistant librarian there.  Paul Thomas is the school principal there.  The Defendants adduced evidence that there came to be open two library clerk or aide positions and that Plaintiff was being considered a prime candidate for the first open position but that another inmate got that position and that Plaintiff was likely to get the second open library clerk/aide position, but before he was offered the position he came into the library when he was not authorized to do so and he admitted to staff that he came to the library without authorization to see if he could get away with doing so.  ECF No. 142-3 at 2.

While Plaintiff subsequently attempted to claim he made an honest mistake in coming into the library at an unauthorized time, the Defendants did not have to believe Plaintiff upon

pain of being found liable for an alleged equal protection violation.[3]  In other words, the

Defendants were free to disbelieve Plaintiff's excuse and find that he willfully broke rules

concerning access to the library and that such behavior rendered him unsuitable for the position

of trust.  This is so, notwithstanding that Plaintiff apparently got a job with the prison's

commissary where Plaintiff says he was "entrusted with thousands of dollars worth of

merchandise."  ECF No. 186 at 2.  Differences in judgments about Plaintiff's trustworthiness

---

[3]  Plaintiff also questions the validity of the reason for passing over Plaintiff, i.e., his sneaking into the library when he was not permitted to do so, by pointing to two "facts."  One "fact" is that this reason (i.e., Plaintiff snuck into the library) allegedly constituted a "bald allegation [which] was conclusory by defendant and was never investigated or corroborated."  ECF No. 186 at 2.  Be that as it may, Plaintiff's characterization of the Defendants' proffered reason as essentially a lie, does not create a genuine issue of material fact.  The rule is that a non-moving party "cannot survive summary judgment simply by asserting that the factfinder might disbelieve the testimony of [the movant's] witnesses[.]"  Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1165 (3d Cir. 1990).  For "[i]t is by now axiomatic that 'a nonmoving party ... cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent's affidavit to that effect.'"  Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 130 (3d Cir. 1998) (quoting Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989)).  "[I]f a moving party has  demonstrated the absence of a genuine issue of material fact--meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole--concerns regarding the credibility of witnesses cannot defeat summary judgment.  Instead, the nonmoving party must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57, (1986).  See also  Corrugated Paper Products, Inc. v. Longview Fibre Co., 868 F.2d 908 (7th Cir. 1989)("[T]he opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof.")(quoting Curl v. International Business Mach. Corp., 517 F.2d 212, 214 (5th Cir. 1975)).  The second of Plaintiff's "facts" is that in the several weeks after it was learned that Plaintiff had tried to sneak into the library and after he had been denied the second library clerk/aide position, the same three defendants on the interview panel that denied him the second clerk/aide position, provided him a call out pass for an interview "to again obtain employment in SCI Greensburg's library" which Plaintiff claims demonstrates that Defendants never actually questioned Plaintiff's trustworthiness.  ECF No. 186 at 2.  However, that the Defendants were willing to give Plaintiff a second chance at least for an interview does not establish that they had not genuinely questioned his trustworthiness when they denied him the second library clerk position.  It is entirely possible that they may have thought that Plaintiff had learned his lesson, so to speak, from his being so denied.  That the Defendants provided him yet another interview, does not undermine the legitimacy of their previously denying him a position based upon their judgment call that Plaintiff was untrustworthy.

between hiring/interviewing panels does not mean that one panel was racist and one panel was not.

Nor do we find that the other evidence of "discriminatory intent" that Plaintiff points to, creates a genuine issue of material fact. Among the evidence he points to are the dismantling of the African-American interest section and the alleged racial imbalance (at one point in time) in the library aides (out of the 8, only 1 was black, and 1 was Hispanic and the other 6 were white). The record is sufficiently clear that the Defendants did not hire him for the library aide because of his behavior and not because of his race and no reasonable jury could find otherwise on this record.

As for Defendant Englebrecht, the Defendants proffered evidence that Defendant Englebrecht was not involved in any manner with the decision to hire or not to hire Plaintiff for the library position. ECF No. 142-5 at 2 to 11. It appears from Plaintiff's own filings the only role played by Defendant Englebrecht was that he was the officer who communicated to Plaintiff that he did not get the second open position. See, e.g., ECF No. 142-5 at 3, ¶ 9 ("Who gave you the authorization to inform Plaintiff that he didn't secure the 2nd and final inmate library aide position."); ECF No. 61 at 3, ¶ 22 ("Plaintiff informed Officer Engelbrecht that he was still waiting for a response from Dawn Davis in reference to the inmate library aid job. Defendant Engelbrecht responded 'you would have gotten the library job had you not tried to sneak into the library.'"); ECF No. 187 at 2, ¶ 11. Plaintiff's "evidence" that in so informing Plaintiff that he did not get the job, Defendant Engelbrecht was "working outside his job description," ECF No. 186 at 3, ¶ 2, adds nothing to show an equal protection violation. Plaintiff is confusing the

messenger, Defendant Englebrecht, for the decision maker.[4]  In fact, Plaintiff concedes that Defendant Englebrecht "went on to secure plaintiff a job in SCI Greensburg's commissary." ECF No. 187 at 2, ¶ 11.  The Defendants are entitled to summary judgment on this claim.

Plaintiff's next claim is a First Amendment censorship claim against Defendants Collins and Davis for their alleged role in disbanding the African American interest section of the library at the prison.  Apparently, at some point there was an area of the library with all of the books deemed to be of African American interest placed in one section of shelves.  Thereafter, those books were integrated into the other shelves of books of the library.

We begin our analysis by noting that prisoners retain a First Amendment right to be from content based censorship.  See, e.g., Olmsted v. Horner, No. 08-cv-438, 2008 WL 4104007, at *5 (W.D.Wis., Sept. 3, 2008)("The First Amendment's guarantee of freedom of speech provides protection from censorship of a prisoner's incoming and outgoing correspondence.").  However, as with most rights retained by prisoners, the First Amendment right to be free of content based censorship is subject to the Turner analysis.  Turner v. Safley, 482 U.S. 78 (1987).  In Turner, the Court listed four factors governing the review of prison regulations:  (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;  (2) whether there are alternative means of exercising the right in question that remain open to prison inmates;  (3) whether accommodation of the asserted constitutional

---

[4] Plaintiff asserts that "Englebrecht also was in the habit of providing references for inmates as well as hiring and firing inmates for block assigned jobs."  ECF No. 192 at 3, ¶ 2 (citing Exhibit 29, i.e., ECF No. 188-29 at 1 to 3).  However, the exhibit he cites only supports the proposition that Defendant Englebrecht gave recommendations concerning prisoners for jobs.  The exhibit is silent as to his ability to hire or fire inmates for block assigned jobs.  Moreover, even if there were evidence that Englebrecht could hire for block assigned jobs there is no evidence that the library aide position that Plaintiff did not get was a "block assigned job."

right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally;  and (4) whether there are reasonable alternatives available to the prison authorities.  Turner, 482 U.S. at 89-90.  "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."  Overton v. Bazzetta, 539 U.S. 126, 132 (2003).  Accord Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 127-28 (1977)("Without a showing that these beliefs [about the threats to penological interests] were unreasonable, it was error for the District Court to conclude that appellants needed to show more. In particular, the burden was not on appellants to show affirmatively that the [prisoners] Union would be 'detrimental to proper penological objectives' or would constitute a 'present danger to security and order.'"); Gates v. Rowland, 39 F.3d 1439, 1447 (9th Cir. 1994) ("The burden is on the inmates to show that the challenged regulation is unreasonable under Turner.").  See also Shaw v. Murphy, 532 U.S. 223, 232 (2001)("Under Turner, the question remains whether the prison regulations, as applied to Murphy, are 'reasonably related to legitimate penological interests.'  To prevail, Murphy must overcome the presumption that the prison officials acted within their 'broad discretion.'") (citations omitted).

Although instantly Plaintiff does not appear to be challenging a prison regulation as such, nevertheless, the Turner analysis applies to actions taken by prison officials which impinge on First Amendment rights even if not taken pursuant to a regulation.  See Bieregu v. Reno, 59 F.3d 1445, 1457 (3d Cir. 1995)("Though the case before us concerns an alleged pattern and practice of official conduct, rather than a prison regulation, application of the Turner standard is appropriate."), implied overruling on other grounds recognized in, Oliver v. Fauver, 118 F.3d 175, 178 (3d Cir. 1997).

Plaintiff's First Amendment claim is that Defendants Collins and Davis dismantled the African American interest section of the library and also discarded some of the books contained therein. ECF No. 61 at 3, ¶¶ 24 to 27.

In their motion for summary judgment, the Defendants provide evidence that while the African American interest section of the library was disbanded, such was done in the process of standardizing the library by introducing the Dewey Decimal System method of cataloguing all of the books and computerzing the card catalogue system.[5] In the course of cataloguing the books that were formerly kept all together in the African American interest section, the cataloguing system required that the books be placed throughout the library where the Dewey Decimal system mandated that they belong, alongside other books with similar Dewey Decimal system numbers.

This evidence establishes that there was no content based censorship occurring, and so there was no First Amendment violation at all. Thus, no <u>Turner</u> analysis is required. To censor is defined as "[t]o officially inspect (esp. a book or film) and delete material considered offensive." Black's Law Dictionary, Special Abridged 8th ed, at 183. 2005. Here, the books

---

[5] Plaintiff claims that Defendant Collins has attempted to create a new reason for the change in the library system, namely, the automation/computerization of the library. In support of this claim, Plaintiff asserts that Defendant Collins's "new" reason of automation is inconsistent with evidence provided by Defendant Thomas. <u>See</u>, <u>e.g.</u>, ECF 136 at 8 to 9 n. 1. However, Plaintiff does not explain how Ms. Collins's proffered justification of her acts in automating the library are inconsistent with the evidence Plaintiff cites to, <u>i.e.</u>, ECF No. 136-1 at 31, ¶ 11, and ECF No. 136-1 at 47 to 48, ¶ 4. Nor does this Court find such evidence to be inconsistent with Ms. Collins's statement that she was attempting to automate the library more by her actions. The evidence cited by Plaintiff simply fails to establish that Ms. Collins's actions, affecting the African American interest section, were not taken to pursue further automation and computerization of the library, which apparently included the integration into the whole of the library the African American interest section, which theretofore had been kept separately in a particular area of the library.

formerly contained in one space were simply spread throughout the collection as mandated by the Dewey Decimal System. Thus, this evidence was sufficient to shift the burden to Plaintiff to establish that there was censorship. At most, what the actions of the Defendants did was make it somewhat less convenient to "browse" through books of African American interest. However, as indicated by the Defendants' evidence, once catalogued and computerized, all a patron would have to do to retrieve such books is type in "African American" in the search function of the library computer to get a printout of books addressing African American subject matter.

In response, Plaintiff adduced evidence that he and others had problems finding African American interest books and that the new system did not work as well as the old system of having all African American interest books physically kept in one place. He also adduced some evidence that in response to his complaints, efforts were made to redress his complaints. See, e.g., ECF No. 186 at 4 (evidence cited therein); ECF No. 188-10 at 2; ECF No. 188-13 at 2 ("Dawn Davis put call letters on all the African-American books that were scattered throught [sic] the library to attempt to make a user friendly system, but this system is not supported by the Dewey system."). This evidence is simply insufficient to establish a genuine issue of material fact that the Defendants acted with a discriminatory intent and acted with an intent to censor, or that content based censorship was even accomplished. At most, the evidence Plaintiff points to is merely evidence of glitches in the attempt to transition to a Dewey Decimal System computerized catalogue from the prior, and, in some ways, inadequate non computerized or less computerized catalogue system.[6] No reasonable jury based on this evidence could find for

---

[6] Contrary to Plaintiff's contention, ECF No. 186 at 4, Defendant Roberts' response to Plaintiff's interrogatories, ECF No. 188-9 at 3, ¶ 11, (wherein Roberts states that it "was probably a year or more after Ms. Davis's arrival at SCI Greensburg that Mrs. Davis approached this Defendant

Plaintiff.

The second aspect of Plaintiff's censorship claims is that he found some number of books[7] from the former African American interest section were thrown out in the trash. ECF No. 61 at 3, ¶¶ 25-26. See also ECF No. 48-1 at 6. Plaintiff filed a grievance and in the grievance response it was explained that in the course of cataloguing the books for the Dewey Decimal system, books that were rarely checked out or books that were worn out were thrown away. That some such books included books from the African American interest section does not establish content based censorship especially given that a large number of books concerning African American interest remained in the library. See, e.g., ECF No. 142-3 at 11, ¶¶ 10 to 15 (affidavit of Ms. Silvis, indicating that a search of the library computer catalogue for "African American" retrieved a list of 242 books).[8] See also ECF No. 150 (noting that the "discarding of books is an

_____

for permission to rearrange the books into what she considered a more 'user-friendly' system" and so Roberts approved the plan), does not contradict Ms. Davis's statement she did not consult with anyone before the African American interest section was dismantled. ECF No. 188-8 at 3, ¶ 8. The evidence, even viewed in a light most favorable to Plaintiff, establishes that Ms. Davis approached Roberts after one year or so on the job and sought his permission to rearrange some aspects of the library, not that she specifically asked or had to ask to dismantle the African American interest section. Even if, as Plaintiff contends, Roberts indicated it was only a year after she was employed when Davis started to rearrange the library, and such contradicts Ms. Davis' statement that she was actually hired to complete the task of rearranging the library and complete the automation, such a contradiction, does not establish anything other than mistaken understandings or recall either on the part of Mr. Roberts or on the part of Ms. Davis. This hypothesized contradiction is simply not material to whether the dismantling of the African American interest section was done as part of a reorganization (regardless of the timing) of the library and not as part of an attempt to engage in censorship.

[7] Apparently, there were seven books *in toto*. See ECF No. 188-15 at 2 to 3 (photocopies of 7 check out cards for 7 books which Plaintiff found in the trash); ECF No. 150 at 5; ECF No. 191-1 at 1.

[8] While Plaintiff challenges the admissibility of the affidavit by Eleanor Silvis, the current librarian at SCI Greensburg, ECF No. 186, at 1, on the grounds that she was not the librarian at the time of the events giving rise to the lawsuit, the information she provided in her affidavit was how

13

ongoing process. Indeed, approximately 100 books were discarded at the time when Plaintiff

allegedly discovered seven African-American history books in the trash.")(citing ECF No. 142 at

9, ¶ 69). Plaintiff concedes that he has "no way of knowing the ethnicity of these additional

books" (ECF No. 187 at 5, ¶ 69), i.e., knowing out of the 100 books how many (other than the 7

he discovered) , if any, were of "African American interest." Without knowing this, he cannot

show that the disposal of the seven or so African American interest books constituted content

based censorship, i.e., that the books disposed of were disposed of because they were of African

American interest. Disposal of seven African American interest books even if they did not fit the

criteria for disposal as Plaintiff contends, at most, establishes negligent trashing of books, not

intentional content based censorship. Hence, the Defendants are entitled to summary judgment.

In the alternative, even if Plaintiff's evidence could establish some content based

censorship had occurred, either in the disbanding of the African American interest section in

order to integrate it into the larger collection or in the disposing of the seven African American

books, Plaintiff's evidence does not satisfy his burden under Turner to show that the Defendants

actions were unreasonable within the contemplation of Turner. His evidence simply fails to

---

the computerized Dewey Decimal "card catalogue" system works now and how a prisoner can
search that computerized catalogue for African American interest, and, inferentially, that this was
how it has worked since the time of the events giving rise to this lawsuit, when the computerized
catalogue was set up. See ECF No. 142-3 at 11, ¶ 8 (Indicating that [p]rior to the beginning of my
employment at SCI-Greensburg, the library catalogue was converted from a card catalogue to a
computerized catalogue."). Thus, Ms. Silvis has personal knowledge as to how the computerized
system works now and by inference how it worked when first instituted. Plaintiff does suggest that
at some point when the computerization first was instituted, it was not possible to search for the
African American books by computer since those books were not immediately given call numbers.
ECF No. 187 at 4, ¶ 38. Even viewing this evidence in a light most favorable to Plaintiff, this
appears to be evidence of nothing more than glitches needing to be worked out in the course of the
conversion. Thus, we reject Plaintiff's claim that the affidavit is objectionable on the ground that
Ms. Silvis has no personal knowledge relevant to the time period.

"overcome the presumption that the prison officials acted within their 'broad discretion.'" <u>Shaw v. Murphy</u>, 532 U.S. at 232 (citations omitted).  Hence, the Defendants are entitled to summary judgment on this basis as well.

Plaintiff's third claim is a First Amendment retaliation claim against Defendant Waters, whom Plaintiff claimed "fired" Plaintiff from his peer-to-peer tutoring position.  The alleged retaliation was taken for Plaintiff's filing of a grievance against Walters and filing the present Section 1983 lawsuit.

In order to prevail on a retaliation claim, a plaintiff must establish: (1) that he engaged in constitutionally protected activity; (2) that he was subject to adverse actions by a state actor; and (3) the constitutionally protected activity was a substantial motivating factor in the state actor's decision to take adverse action.  <u>Anderson v. Davila</u>, 125 F.3d 148, 161 (3d Cir. 1997)(<u>citing</u> <u>Mt. Health City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274 (1977)).  Furthermore, in order to demonstrate the second prong of adverse action, Plaintiff must adduce evidence of an action sufficiently negative to "deter a prisoner of ordinary firmness from exercising his First Amendment rights."  <u>Allah v. Seiverling</u>, 229 F.3d 220, 225 (3d Cir. 2000).  If the plaintiff proves these elements, the burden shifts to the state actor to prove that it would have taken the same action even without the unconstitutional factors.  <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. at 287.  In the prison context, the state actor may rebut a plaintiff's claim by showing that their actions were motivated by legitimate penological objectives.  <u>Pratt v. Rowland</u>, 65 F.3d 802 (9th Cir. 1995).

It is Plaintiff's burden to prove that the Defendants were motivated by retaliation against Plaintiff.  <u>See</u> <u>Hannon v. Speck</u>, Civ. A. No. 87-3210, 1988 WL 131367, at *4 (E.D.Pa. Dec. 6,

1988) ("In bringing a §1983 action alleging such retaliation, an inmate faces a substantial burden in attempting to prove that the actual motivating factor ... was as he alleged.") (internal quotes and citation omitted), aff'd, 888 F.2d 1380 (3d Cir. 1989)(Table).   Even if a plaintiff successfully alleges that retaliation was the substantial motivating factor, the plaintiff's claim can be defeated by "demonstrating that the same action would have been taken even in the absence of the protected conduct."  Green v. Philadelphia Housing Authority, 105 F.3d 882, 885 (3d Cir. 1997).

Instantly, the Defendants have adduced evidence that Plaintiff was not "fired" from the voluntary peer-to-peer tutoring program.  Rather, the Defendants point out that Plaintiff was simply dropped from the call out list for the tutoring program because when Plaintiff should have been participating in the program, he was playing basketball instead and Defendant Walters actually saw this occurring.  Consequently, Mr. Walters apparently removed Plaintiff's name from the call out list for the peer-to-peer tutoring program.[9]   The Defendants further explained that if Plaintiff wanted to continue tutoring, all he needed to do was to request to be placed back on the waiting list, which he failed to do.  Thus, we find that the only evidence of an adverse action on the part of Mr. Walters was to take Plaintiff's name off the call out list for the tutoring program.  We do not find this a sufficiently adverse action under the standard, given the ready ability to rectify this situation, which was in Plaintiff's hands, namely, request to be placed back

---

[9]  Essentially, in order for a prisoner to go anywhere in the prison, they need a pass, which is a computer generated pass indicating where they are permitted to go and at what times.  If an inmate is not on a call out list, then no computerized pass will be generated for that prisoner.  See ECF No. 142-6 at 19, ¶ 13.  Moreover, the computerized call out system is set up in such a way that it is impossible to have two call out passes issued for a single prisoner for any overlapping period of time.

on the call out list. That Plaintiff allegedly did not know that such request was an option, ECF No. 186 at 6, does not mean that his being taken off the call out list constituted an adverse action, since Mr. Walters informed Plaintiff of this option in his grievance response, notwithstanding the fact that, at that point in time, Plaintiff had already been placed in administrative custody, pending a separation from Mr. Walters.

However, even if being taken off the call out list for the library were sufficiently adverse to satisfy a First Amendment retaliation claim, the Defendants adduced sufficient evidence to show that Mr. Walters would have taken the same actions even without Plaintiff engaging in any protected activity, given that Mr. Walters himself observed Plaintiff playing basketball when he should have been participating in the peer-to-peer tutoring program.[10]

---

[10]  Plaintiff attempts to suggest that Mr. Walters' action was retaliation for the filing of the present lawsuit. Plaintiff claims that the lawsuit was filed on January 4, 2008 and that he was fired as a tutor on January 17, 2008. ECF No. 186 at 5. However, the docket clearly shows that Plaintiff's IFP motion was not granted until February 15, 2008 and only thereafter was service upon the defendants ordered. Only after service would the defendants have known that they were being sued. Plaintiff produces no evidence to show that Mr. Walters knew on January 17, 2008, the date Mr. Walters "fired" Plaintiff , that a suit was filed on or about January 4, 2008. Plaintiff points to an answer by Defendant Thomas to show Walters knew of the case. The evidence pointed to is that Thomas said Walters told Thomas whenever Plaintiff came to tutoring, Plaintiff refused to work with students because Plaintiff was too busy working on the case accusing the librarian of racism. ECF No. 192 at 5; ECF No. 188-26 at 3, ¶ 19.  This statement is at best ambiguous as to what "the case" means. It could simply have meant that Plaintiff was too busy preparing the grievances accusing the librarian of racism. But in any event, Plaintiff fails to offer any explanation as to why Defendant Walters would want to retaliate against Plaintiff for filing a suit against the librarian. To the extent that Plaintiff claims Walters was retaliating against Plaintiff for filing a suit against Walters, again, there is no evidence that Walters knew, at the time of "firing" Plaintiff from the tutoring job that he had named Walters as a defendant in this suit.

The same is true of any of Walters' alleged retaliation against Plaintiff for his filing of grievances. The alleged retaliatory action taken by Walters was Walters seeking a separation from Plaintiff. Walters adduced evidence that he did not know of Plaintiff's filing of any grievance against Walters at the time when Walters requested a separation from Plaintiff. ECF No. 151at 4, ¶ 7. The best evidence Plaintiff can come up with to counter this evidence is his citation to a policy that indicates a staff member against whom a grievance is made is to be "immediately" notified. ECF No. 189 at 3, ¶ 7. Plaintiff does not provide a cite to that policy. Nor does he show that in this

Tellingly, Plaintiff does not deny that he was scheduled to be at the peer-to-peer appointment. Rather, he claims that he had a pass for basketball and not a pass for the peer-to-peer session. He claims that with this pass he could only have attended the basketball game and could not have gone to the peer-to -peer session. While Plaintiff argues that he had only a pass to go to intramural basketball, he nowhere asserts that he was unaware of his obligation to the tutoring program and he completely fails to adduce evidence that he could not have rectified the situation by indicating to staff that he had an obligation to tutor and hence, was mistakenly given a pass to play basketball. He fails to explain why he could not have fulfilled his obligation to the tutoring program by requesting staff assistance to obtain the correct pass. Plaintiff's failures in this regard (his failure to attempt to comply with his obligation to the tutoring program by taking any remedial steps) were surely sufficient reasons for Mr. Walters to take Plaintiff off of the call out list for tutoring. Indeed, the Defendants offer compelling evidence that removing Plaintiff from the call out list was not retaliatory but simply done in due course as with any others who fail to show up for a tutoring session for which they are scheduled. ECF No. 142 at 29 (email from Walters to Thomas stating "I dropped him [i.e., Plaintiff] from the tutoring program

---

case, the policy was followed, or even if followed, what "immediately" means within the contemplation of the policy, given that Mr. Walters filed a request for separation from Plaintiff merely three hours after Plaintiff filed the grievance against Walters.

Plaintiff also points to a number of alleged inconsistencies in the evidence. See, e.g., ECF No. 186 at 6. Chief among these alleged inconsistencies is an answer by Defendant Walters to a request for admissions, wherein Defendant Walters stated that he did not seek authorization from his supervisor, Defendant Thomas, to take Plaintiff off of the call out list. Plaintiff contends that this is inconsistent with an answer provided by Defendant Thomas, who stated that he instructed Defendant Walters to terminate Plaintiff from the tutoring program. However, even if we accept that these answers are inconsistent, such does not create a genuine issue of material fact as to whether Defendant Walters retaliated against Plaintiff. Indeed, none of the alleged inconsistencies creates a genuine issue of material fact.

because of his unexcused absence. I just dropped four (4) people today from the tutoring

program for the same reason – you miss, you get dropped.").[11]  Thus, summary judgment should

be granted to the Defendants on Plaintiff's First Amendment retaliation claim.  Mr. Walters

personally observed Plaintiff at the basketball game, when, according to Mr. Walters, Plaintiff

should have been in the peer-to-peer session.  Plaintiff complains that Mr. Walters should have

excused his failure to appear in light of the fact that Plaintiff possessed only a pass to go to the

basketball game.   However, it was entirely within Mr. Walters' discretion as to whether to credit

Plaintiff's story and as Plaintiff recounts, Mr. Walters did not credit his story, even going so far

as to call Plaintiff a liar.[12]   ECF No. 188-33 at 4, ¶ 50.

---

[11]  In a grievance, Plaintiff claimed he was treated differently from two other Caucasian inmates, whom he alleges missed many days from the peer to peer tutoring program without an excuse but were not taken off the call out list for the tutoring program. ECF No. 188-33 at 5, ¶ 58. Even if we considered this proper summary judgment evidence, but see Nix v. O'Malley, 160 F.3d 343, 347 (6th Cir. 1998) ("The district court therefore properly granted summary judgment on Nix's second and third claims, which rely on nothing but unsupported, unsworn allegations in his complaints and briefs."); Baxter v. Railway Express Agency, Inc., 455 F.2d 693, 696 (6th Cir. 1972) ("[t]he unsworn averments of a complaint will not suffice, on motion for summary judgment, to put in issue facts set out and sworn to in an affidavit supporting such motion."), such would not be sufficient to establish a genuine issue of material fact because Plaintiff does not reveal the basis of his knowledge that these two unnamed Caucasian inmates had no excuses for their absences. While it is true that "the nonmoving party need not produce evidence in a *form* that would be admissible at trial," Thomas v. International Business Machines, 48 F.3d 478, 485 (10th Cir. 1995)(internal quotations omitted), nevertheless, the affidavit must, at the least, reveal the basis of the affiant's personal knowledge of the facts attested to so as to be competent evidence under the requirements of Rule 56.  Ways v. City of Lincoln, 909 F.Supp. 1316, 1322 (D. Neb. 1995)(commenting on the requirement of Rule 56(e) that the affidavit "show affirmatively that the affiant is competent to testify as to the matters stated therein", the court concluded that "[a]t a minimum this means that the affidavit must establish the competence of the affiant to testify about the subject matter of his or her affidavit.").  See also Cooper v. Diggs, NO. CIV.A. 07-1557, 2010 WL 2331067, at *7  (W.D.Pa. June 4, 2010)("Plaintiff's verified complaint lacks such an affirmative demonstration of how Plaintiff knows what Defendant Diggs allegedly said to Defendant Brown, and hence is incompetent to create a genuine issue of material fact.").

[12]  It appears that in addition to computer generated passes, there may be instances of handwritten passes as well. It appears that Defendant Walters asserted the Plaintiff had obtained

Plaintiff's next claim is an equal protection claim for the same actions taken by Defendant Walters. Plaintiff has failed to show that he was treated any differently from anyone else who absented himself from the peer-to-peer tutoring program and whose "obsession with racially motived injustice behind every action observed has led to your [i.e., Plaintiff's] sarcasm and alienation of those entrusted for your care and custody." ECF No. 188-19 at 2. In other words, Plaintiff has failed to show discriminatory treatment of himself.

Plaintiff's last claim is an alleged Eighth Amendment violation of deliberate indifference to his medical needs against Defendant Kwisnek. Plaintiff bases this claim on the fact that while housed in the RHU awaiting transfer to another institution due to Mr. Walters' request for a separation from Plaintiff, Plaintiff was allegedly "denied proper medical care when he was not allowed to maintain his medication schedule, and was denied certain other medications all together." ECF No. 61 at 4, ¶ 36.

The Defendants have moved for summary judgment on this claim on several grounds. The first ground they raise is Plaintiff's failure to exhaust his administrative remedies. They provide evidence that Plaintiff "did not file any grievances at SCI Greensburg in the year 2008 that concerned medical or conditions of confinement issues to the final review level." Affidavit of Tracy Williams, employed by the DOC Grievance Review Office, ECF No. 142-7 at 34, ¶ 10.[13] Moreover, the Defendants point out that because Plaintiff failed to do so and may not now

---

such a hand written pass in order to attend the basketball game notwithstanding that Plaintiff had a computer generated pass for the tutoring program. ECF No. 188-33 at 4, ¶ 49 ("I [i.e. Plaintiff] explained that there was no way I could've been in the gym at 3:00pm unless I had a pass, Charles [Walters] then accused me of having a staff member write me a pass.").

[13] Plaintiff objects to the affidavit of Tracy Williams based upon the allegation that she intentionally lied in the affidavit when she stated that the goldenrod copy of the grievance form

do so given the time limits set forth in DOC's grievance policies, Plaintiff has procedurally defaulted this claim.

In response, Plaintiff argues that on June 11, 2008, after he was transferred out of SCI Greensburg to SCI Somerset, he learned that he had an elevated A1C level,[14] and he attributes this to the fact that when he was at SCI Greensburg, he was allegedly not getting his medication in the morning at the correct time,[15] i.e., shortly after eating his breakfast. So upon learning of

_____

(which is a single page form with multi colored carbon copy pages behind the single top page) goes to her office and the goldenrod copy is returned to the inmate, when, according to Plaintiff, the goldenrod copy is initially retained by the inmate and it is the pink copy that is returned to Plaintiff as a receipt/proof of filing.  ECF No. 186, at 1.  Plaintiff suggests that this "purposeful lie" renders her entire affidavit objectionable.  We disagree.  First, there is no evidence that Ms. Williams' statement was an intentional lie as opposed to a mere misstatement.  Moreover, even if it were an intentional lie, such would not render the entire affidavit objectionable.  See, e.g., Teltschik v. Williams & Jensen, PLLC, 683 F.Supp.2d 33, 44 (D.D.C. 2010) ("Even if the false statement were in Bonfiglio's declaration, the Court still would not strike the declaration in its entirety. See Aftergood v. Central Intelligence Agency, 355 F.Supp.2d 557, 565 (D.D.C.2005) (stating that if the challenged affidavit contained inaccurate information, 'the court would merely excise the false statement' instead of striking the affidavit in its entirety).").  Plaintiff does not show that he did in fact exhaust his administrative remedies or that Ms. Williams statement that he did not do so is incorrect or false.  Hence, we overrule any objection Plaintiff may have to Ms. Williams' affidavit, which establishes that Plaintiff did not exhaust his administrative remedies.

[14]  The A1C level reflects a patient's average blood sugar level for the preceding 2-3 months and is used to gauge how well the patient is managing his diabetes.

http://www.mayoclinic.com/health/a1c-test/MY00142

[15]  It is pure speculation on Plaintiff's part that his elevated A1C level occurring on May 30, 2008 was due to the his alleged late receipt of his morning medications. See ECF No. 186 at 9 ("This medication schedule caused plaintiff's A1C level to rise to a dangerous 9.6.").  The Defendants supplied evidence of Plaintiff's elevated A1C levels occurring even when Plaintiff apparently had no complaints about taking his medication in a timely manner, i.e., from February 21, 2006 to December 5, 2007.  ECF No. 166, at 2; ECF No. 166-1 at 7 to 8. It appears that Plaintiff could self medicate when he was not in the RHU.  It appears that since March 11, 2008 or soon thereafter, Plaintiff was apparently receiving his morning medications as needed, i.e., at the time he was supposed to.  There simply is no medical evidence that not receiving one's medication in the morning immediately after breakfast, which circumstance had ended around March 11, 2008, could

this elevated A1C level, he filed a grievance concerning the elevated levels and what he considered to be its cause. We note that the time during which Plaintiff was allegedly not receiving his medication in a timely manner was the time during which he was placed in the RHU after Defendant Walters had requested a separation from Plaintiff, which occurred on or about February 11, 2008. ECF No. 142 at 14, ¶¶ 106 to 107; ECF No. 188-25 at 2 ("Other Report" indicating Plaintiff was placed in Administrative Custody due to separation request made by Defendant Walters). Plaintiff was in the RHU for thirty days[16] or roughly until March 11, 2008, when he was transferred to SCI Somerset. We find the filing of the grievance in June 2008 to be untimely regarding the failure to provide him medication in a timely manner during Plaintiff's stay in the RHU on Administrative Custody which ended on or about March 11, 2008. ECF No. 142-7 at 32, ¶ 3 ("DC-ADM 804 requires that an individual grievance be filed within 15 days of the events alleged in the grievance. Grievances that are filed late are dismissed as untimely."). Plaintiff utterly fails to explain that if his problem was not receiving his morning medications in the RHU while he was housed in the RHU, why he did not file a grievance then, at the time he was not getting his medications timely, especially since he himself acknowledges that while he was in the RHU he was informed by the SCI Greensburg's medical department that there was no one scheduled early in the morning to cover the RHU. ECF No. 193, at 1. If, in fact, he were not receiving his medication as he needed to be, he should have filed a grievance

---

result in elevated A1C levels sometime much later, i.e., May 30, 2008, after an intervening period of receiving the medications timely. In fact, there simply is no medical evidence that the timing of the medication as opposed to something else raised Plaintiff's A1C levels given that his A1C levels were consistently high even prior to Plaintiff's entrance into the RHU, where he could not self medicate.

[16] ECF No. 186 at 8.

then, and that he did not is telling. Hence, we find that there is no material issue of fact regarding Plaintiff's failure to exhaust his administrative remedies.

In the alternative, the Defendants also note that Defendant Kwisnek had no personal involvement in the alleged failure to provide Plaintiff his medications. The Defendants adduced evidence that Kwisnek was the Health Care Administrator and, as such, had no responsibility for direct patient care such as administering medication. In addition, although she approved the schedules for the medical staff, she had no responsibility for assuring that SCI Greensburg was sufficiently staffed on a day to day basis. The responsibility for approving staff leave requests rested with the Deputy Corrections Superintendent.

The rule in Section 1983 civil rights cases, such as the instant one, is a plaintiff must show evidence that a defendant was personally involved in the deprivation of rights as there is no respondeat superior liability permitted under Section 1983. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) ("liability [in a civil rights action] cannot be predicated solely on the operation of respondeat superior."). "A defendant in a [§ 1983] action must have personal involvement in the alleged wrongs." Id. "Personal involvement can be shown through allegations of personal direction or of actual [contemporaneous] knowledge and acquiescence." Id. Accord Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) ("Her amended complaint likewise does not contain even a remote suggestion that Attorney General Fisher had **contemporaneous,** personal knowledge of her transfer and acquiesced in it.") (emphasis added).

Instantly, the Defendants have shown that Defendant Kwisnek was not personally involved in the failure to provide Plaintiff medication. Hence, the Defendants are entitled to summary judgment on this claim based on such failure.

In the alternative, the record evidence establishes that Defendant Kwisnek had no knowledge of Plaintiff's lack of medicine being provided at the proper time such that she could be found deliberately indifferent.

The Supreme Court has explained that analysis of a violation of the Eighth Amendment involves a two pronged inquiry: (1) an objective inquiry into the qualitative nature of the harm suffered by the victim of the alleged punishment and (2) a "subjective inquiry" into the mind of the person inflicting the harm. See Wilson v. Seiter, 501 U.S. 294 (1991). Accord Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000)("A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect.").

As to the subjective component, in cases involving the denial of medical care, the Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain ... proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (internal quotations omitted). The Court has held that "deliberate indifference" occurs when a prison "official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). As a corollary of the deliberate indifference standard, mere negligence by staff at the prison, medical personnel and physicians in treating prisoners is not sufficient to state an Eighth Amendment violation. Estelle, 429 U.S. at 105-06. The Supreme Court has held that

in the medical context, an inadvertent failure to provide adequate medical care

24

cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

Id. Instantly, the Defendants have pointed out that Plaintiff failed to adduce evidence of the subjective prong as is his burden. ECF No. 143 at 21. Moreover, they have adduced contemporaneous medical documentation from February 1, 2008 to March 31, 2008 showing that Plaintiff received his medications at the 7 AM time. ECF No. 166-1 at 2 to 5. Plaintiff objects to these medical records complaining that they have handwritten notations on them for "SMR" meaning SCI Somerset, when the alleged delay of medication occurred at SCI Greensburg. However, Plaintiff fails to show that this means the medication charts concerned his time at SCI Somerset, as opposed to the notation showing that, at the time the Defendants' counsel requested the medical records, i.e., after the initiation of this suit, Plaintiff was at SCI Somerset and that is where the medical records came from, i.e., the historical medical records follow Plaintiff from prison to prison. Hence, contrary to Plaintiff's unfounded claims, the critical pieces of evidence are the date blocks at the bottom of the medication charts indicating the time frame for the medication administration. Indeed, critically, given that Plaintiff apparently self administered his medications prior to coming to the RHU, which was sometime on February 11, 2008, the medical records indicating when Plaintiff received his medications at the hands of the RHU staff starts in the box indicating the evening of February 11, 2008. Moreover, the space for "facility" on the medication chart, indicates "SCI Greensburg." In light of this, Plaintiff's objections to these

25

documents are unpersuasive and properly overruled.[17]  Thus, based on this record evidence,

Defendant Kwisnek could have reasonably believed that Plaintiff was receiving his medication at

the time he should have.  Hence, the Defendants are entitled to summary judgment on this claim.

Thus, this evidence, in combination with the evidence that Plaintiff did not file a

contemporaneous grievance concerning the alleged failure to timely provide his morning

medications, more than overcomes Plaintiff's assertion that the medical records only show that

he was **supposed** to receive his medications at that time.  ECF 189 at 4.  In any event, he has not

shown that Defendant Kwisnek's access to these records and any reliance thereon to conclude

that Plaintiff was receiving his medications timely satisfied the subjective prong of deliberate

indifference.  In other words, he has not shown that the Defendant Kwisnek knew of the alleged

falsification of the medication charts and so knew that Plaintiff was not receiving his morning

medications at 7 AM as the charts indicated.

In the alternative, we find that the record evidence establishes that there is no genuine

issue of material fact concerning whether the Defendants are entitled to qualified immunity for

the actions which the record establishes that they took.  It would not have been clear to the

Defendants that integrating the African American interest section into the rest of the library

violated any of Plaintiff's clearly established rights.  Nor would it have been clear to the

Defendants that taking Plaintiff off of the call out list for peer-to-peer tutoring after he failed to

show up violated any of Plaintiff's clearly established rights.  Nor would it have been clear to the

---

[17]  Similarly, Plaintiff's objections to his medical records that show he had consistently high A1C levels are properly overruled because there is no basis for such an objection.  That more records were not provided does not render these medical records objectionable.  See ECF No. 189 at 4 & 5.

Defendants that not hiring Plaintiff for a library aide position when they believed him to have been in the library at an unauthorized time and deliberately so, violated any of Plaintiff's clearly established rights.  To the extent that the Defendants did not raise the qualified immunity defense, a court may do so sua sponte.  <u>Layshock v. Hermitage School Dist.</u>, 496 F.Supp.2d 587, 603 (W.D.Pa. 2007).  The Defendants are entitled to qualified immunity as to all of Plaintiff's claims.

Accordingly, for any or all of the foregoing reasons, we find that the Defendants are entitled to summary judgment as to all of Plaintiff's claims.

### III.  <u>CONCLUSION</u>

Pursuant to the Magistrate Judges Act, 28 U.S.C.  § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Civil Rules, the parties are allowed to file objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation, a copy of which docket entry is being mailed to Plaintiff along with the Report.  Failure to timely file objections may constitute a waiver of any appellate rights.  Any party opposing objections may file their response to the objections in accordance with Local Civil Rule 72.D.2.

Respectfully submitted,


_/s/ Amy Reynolds Hay_____
Chief United States Magistrate Judge

Dated: 7 September, 2010

cc:    The Honorable Terrence F. McVerry
       United States District Judge

       Aaron T. Jones

GN-0629
S.C.I. Fayette
Box 9999
LaBelle, PA 15450-0999

All counsel of record by Notice of Electronic Filing